Confidential Treatment Requested



# WELLS SUBMISSION ON BEHALF OF MOISES SABA, TENTAFIN

# LIMITED AND ALBERT SUTTON

IN RE:

**TRADING IN THE SECURITIES OF** *TV AZTECA* **(HO 9304)**

### NIXON PEABODY LLP

**437 MADISON AVENUE
NEW YORK CITY, NEW YORK
212/940-3000**

New York
June 11, 2003

PX21-0001

Confidential Treatment Requested

## INTRODUCTION

This Wells Submission is submitted on behalf of Moises Saba ("Saba"), and Tentafin, Limited ("Tentafin"), a foreign company he controls, and his brokerage account representative, Albert Sutton ("Sutton"). Collectively Saba, Tentafin and Sutton are referred to as the "Proposed Respondents").[1] The enforcement staff ("Staff") has informed the undersigned counsel to Mr. Saba, Tentafin and Mr. Sutton that it intends to recommend that the Commission file a civil action in federal court against the Proposed Respondents seeking a permanent injunction, disgorgement and prejudgment interest, and penalties for violations of Section 10(b) of the Securities Exchange Act of 1934 ("the "Exchange Act") and Rule 10b-5 thereunder. The Staff also intends to seek authorization to commence a public administrative proceeding against Sutton pursuant to Section 15(b) of the Exchange Act seeking to censure, suspend or bar Sutton from the securities industry. For purposes of this Wells, we assume that The Staff's contention that the Proposed Respondents violated section 10b and rule 10b-5 is predicated upon conduct prohibited by section 9(a)(2) and (6) of the Exchange Act.

The Staff has informed the Proposed Respondents that their recommendation to the Commission is based upon allegations that Mr. Saba, and his Middlegate Securities, Inc. ("Middlegate"), account representative, Mr. Sutton entered a series of limit orders purchasing

B1272877.1                                                    6/12/2003 6:33 PM

-2-

PX21-0002

**Confidential Treatment Requested**

200,000 shares of TV Azteca in Saba's Tentafin account during the last 10 minutes of the trading

day on August 20, 1999,[2] with the unlawful intent to orchestrate a day end close at or above

$5.00 per share. The Staff contends that Saba's reason for doing so was because Tentafin was

short 8,600 TZA August puts at $5.00 per share meaning that if the per share price of TZA closed

at or below $5.00 on August 20th 1999, Saba's Tentafin account might be put 860,000 shares of

TZA at a price of $5.00 per share. Said differently, the staff claims Tentafin might have had to

purchase $4.3 million worth of TZA at $5.00 per share when its publicly traded price **that day**

**could have been less than $5.00.** The Staff has articulated no reason or motivation why Sutton

would have engaged in the alleged manipulation.

Specifically, the Staff contends that on August 20, 1999, at approximately 3:50 p.m. TZA

stock was hovering around $5.00 per share or fractionally lower when Saba and his broker,

Sutton, entered a series of TZA limit orders for Saba's Tentafin account. The series of limit

orders were, the Staff claims, intended to peg or fix TZA's closing price above $5.00. Sutton,

the Staff contends concealed his unlawful acts by mis-marking the order tickets as market orders

to purchase a total of 200,000 shares of TZA, when in fact the Staff contends the orders were

limit orders. This action, the Staff asserts constituted a scheme or artifice to defraud by the

Proposed Respondents in that it rose to the level of market manipulation intended to avoid an

---

[2] One must question the Staff's sense of fundamental fairness in commencing non-formal order investigatory testimony almost three (3) years after the trade in question, let alone the fundamental un-fairness of a recommendation against a registered representative and private investor almost four (4) years after a trade. One's ability to recall specific facts, thought processes, and events obviously diminishes over time even as to significant and unique matters. Here, the Staff is looking to force Mr. Saba and Mr. Sutton, both individuals whom engage in thousands of securities trades annually, to defend a single un-noteworthy securities transaction in a security they frequently trade. This smacks of unfairness on its face.

B1272877.1                                                                6/12/2003 6:33 PM

-3-

PX21-0003

**Confidential Treatment Requested**

860,000 share put at $5.00 in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

The Proposed Respondents deny the Staff's allegations and conclusions, and contend the recommendation is not supported by the investigative record, is devoid of merit, and if accepted and litigated would be rejected by a Court as a substantially unjustified expansion of the Commission's use of Section 10(b) of the Exchange Act, thus entitling Saba, Tentafin and Sutton to attorney fees and costs awards pursuant to a petition under the Equal Access to Justice Act codified at 28 U.S.C. § 2412. See, e.g., SEC v. Morelli, 1995 U.S. Dist. Lexis 141 (S.D.N.Y. 1995). Accordingly, we request the Staff reconsider its intended recommendation or, alternatively, the Commission vote <u>not</u> to authorize the proposed civil action.

## I.      THE STAFF'S THEORY OF LIABILITY

We understand the Staff's recommendation is based upon their belief that Mr. Saba, and his Middlegate account representative, Sutton, entered a series of limit orders to purchase TZA in Tentafin's account at increasingly higher prices during the last 10 minutes of the trading day with the intent of manipulating TZA's price to close at or above $5.00 per share. The Staff claims Saba and Sutton were motivated to do this because Saba's Tentafin brokerage account was short 8600 TZA puts at $5.00 which would not be assigned but instead expire worthless if TZA closed at or above $5.00 per share. The Staff alleges this would be a substantial benefit to Saba and his Tentafin account because he would not have to purchase the 860,000 TZA shares if the put were not assigned. Tentafin had an alleged $753,000 profit on the premium associated with its shorting the puts months before.

B1272877.1                                                      6/12/2003 6:33 PM

-4-

**Confidential Treatment Requested**

The Staff's theory of the actual manipulation is not entirely clear. Under one scenario the Staff seems to contend that Mr. Sutton placed three limit orders, the first to buy 100,000 shares, and then increased the order to 150,000 and then upped the order a third time to 200,000 shares to ensure that the goal of maintaining TZA's price at or above $5.00 per share was accomplished. The Staff seemingly derives this theory from the order ticket Mr. Sutton filled out on August 20, 1999 which is time stamped at 3:50 p.m. Alternatively, the Staff seems to contend that Mr. Saba and Mr. Sutton, acting in concert, executed a series of four smaller end of day TZA limit orders with the intent to, and effect of, causing the stock to close at 5 1/8. The Staff derived this alternative theory, we believe, from a review of Sutton's employer's clearing firm ("Pershing") "Member Firm Log" for trade date August 20, 1999 reflecting the NYSE merged order/report data showing Pershing's TZA order entry and execution of Tentafin TZA trades called in by Sutton. The merged order report reveals the subject Tentafin trades were entered and executed within seconds as follows:

- 50,000 buy at 5 1/16 at 15:51
- 50,000 buy at 5 3/16 at 15:54
- 25,000 buy at 5 3/16 at 15:57
- 25,000 buy at 5 1/8 at 15: 58
- 55,000 buy at 5 3/8 at 15:59

The Staff contends that these orders were called in to Middlegate's clearing firm, Pershing, as limit orders progressively in order to artificially peg the market at or above $5.00 per share to ensure that Tentafin was not put the 860,000 TZA shares.

B1272877.1                                                                6/12/2003 6:33 PM

PX21-0005

Confidential Treatment Requested

## II.   THE PROPOSED RESPONDENTS DISPUTE THE STAFF'S ALLEGATIONS AND REASONING

For the reasons described below, we believe the Staff's intended recommendation is unprecedented, not supported by the investigatory record, and is based upon flawed reasoning. We are aware of no market manipulation case authorized and litigated by the Commission against a customer and his broker where the customer's strategy of averaging down its net cost in a security and the account's broker's efforts to achieve best execution for the customer are alleged to constitute market manipulation.   The investigatory record reveals uncontroverted testimony of the following; (1) the investor owned and controlled a substantial position in the subject security more than Fifty-Three Million (53,000,000) shares of TZA, (2) was substantially hedged against the $5.00 TZA puts he was short based upon being short 11,500 TZA calls at $5.00; i.e., if TZA went above $5.00 per share 1,150,000 TZA shares could be called away from Tentafin at $5.00 until the option expired in November 1999, and therefore had substantial downside risk if TZA traded above $5.00, but little to no economic risk if 860,000 shares of TZA were put, (3) over the prior 30 days was being put TZA security at $7.50, which was roughly $2.00 above the issue's trading price, (4) stood to be put almost 500,000 shares more on August 20, 1999 at $7.50 per share when it was trading around $5.00, (5) had the possibility, but not the certainty, of being put up to an additional 860,000 shares at $5.00 per share which he desired in order to average down his net cost of being put 815,000 shares of TZA at $7.50 per share, (6) purchased 200,000 shares at a net price of $5.1369 per share to cost average part of the $7.50 TZA puts, and those shares were held for months before selling in connection with being assigned the TZA calls he was short. Saba's Tentafin account alone had between $36,000,000

B1272877.1                                                    6/12/2003 6:33 PM

PX21-0006

Confidential Treatment Requested

and $49,000,000 of buying power available to cover the purchase of 860,000 shares at $5.00. In short, Mr. Saba had rational and plausible financial reasons for purchasing the 200,000 TZA shares, financial risks if TZA traded above $5.00, and the ability to pay for the stock that might be put to him, many times over. Moreover, Mr. Sutton simply took an unsolicited order from his client that was not unusual or inconsistent with their prior dealings such that he should have questioned Mr. Saba's motivation for the purchase. Mr. Sutton's execution of the order was designed to least affect TZA's price and evidences nothing that would support manipulative of intent.

### A.    Saba/Tentafin's Timing is not Suspicious

The Staff's suspicions about the timing of the subject order are easily rebutted. TZA traded roughly 64,000 shares prior to the August 20, 1999, Tentafin trade questioned by the Staff. TZA's price was at approximately $5.00 at 3:50 p.m., August 20, 1999. Saba's Tentafin account was being put roughly 500,000 TZA shares at $7.50 that day, and Mr. Saba was not sure whether he would be put enough TZA stock at $5.00 to lower materially his cost average from the $7.50 puts, even taking into account the premium earned on the short puts. When 4:00 p.m. approached, Mr. Saba's judgment to begin buying TZA at or about $5.00 per share is rationally explained. It is reasonable to conclude that considering the limited volume and the price hovering around the existing $5.00 put price that Saba concluded that Tentafin was unlikely to be put the 860,000 TZA shares at $5.00 even if it closed at or below $5.00, so he would be wise to start offsetting the $7.50 puts with some $5.00 stock. Given that there was a possibility but no assurance that he would be put even some of the $5.00 stock, the arbitrary number of 200,000 shares makes logical sense, particularly considering Tentafin's short call position at $5.00.

B1272877.1                                        6/12/2003 6:33 PM

-7-

PX21-0007

Confidential Treatment Requested

The Staff assumes in response to this argument that Tentafin $5.00 TZA puts would not be exercised if the Stock closed at or just above $5.00 per share. That assumption is, in fact, wrong. The Proposed Respondents' experience when taking large option positions is that some of the option may be assigned even when the price, in the case of a put, is at or just above the strike. This is because a seller in the market with – to use the facts of this case – 860,000 shares of TZA could not sell that many shares into the market without "knocking down" the per share price resulting in a lower than $5.00 net price. Accordingly, an option holder may nonetheless assign the option at $5.00 even when the price is slightly above $5.00 to insure he gets sold the shares he desires at a guaranteed price. An example of this is evidenced by the highlighted four representative transactions on exhibit 1. The converse is also true. If the price were only slightly below $5.00, it is possible that only a small portion of the shares would be put because if the trading price of TZA is only a fraction below the put strike price, the putting party may have to purchase the shares, pay a commission on the purchase, and then pay a commission to sell them to Tentafin. All this has a real financial cost to the "putting" party that may limit one's desire to assign the put even if it is fractionally "in the money".

### B. The Staff's Assumption that Saba/Tentafin Manipulated TZA's Closing Price to Avoid the Put is Wrong

The Staff's theory as to why Saba allegedly manipulated TZA's close is also wrong.[3]

First, the Tentafin order was worked by Sutton–as the order ticket reveals- as a 200,000 share "not held" market order. Not as a 200,000 share limit order.

---

[3] Saba and Sutton recognize that the financial numbers may seem extraordinarily large and therefore the prospect of facing put a multimillion dollar position may raise suspicions in and of itself, however, we encourage the reader to take into context the investment strategy, sophistication *(footnote continued on next page)*

B1272877.1                                             6/12/2003 6:33 PM

PX21-0008

**Confidential Treatment Requested**

Approximately 64,000 shares of TZA traded as of 3:50 P.M.  If Sutton had simply put in a 200,000 share order at the market or at a 51/8 or higher limit, the impact on the price would likely have been substantial.  Considering the volume, the price might have been driven to $6.00 a share or higher.  Sutton's objective was to execute the 200,000 share order in a way that would have a minimal impact on the price so that the whole order would be filled at the lowest price possible.  In other words, Sutton was trying to obtain best execution of the order.

This was typical of how Sutton would execute Saba's orders.  Because Saba's orders are substantial in size, often involving several hundred thousand shares and sometimes a million or more, his orders need to be worked in increments in order to provide high quality executions.  Because the order is "market not held", Sutton has some discretion as to the manner and timing of executing orders.  This enables Saba to take advantage of Sutton's expertise and access to real time market information.  It also in turn enables Sutton to take advantage of Pershing's expertise and even closer proximity to the market in working the order on a "not held" basis.

In order to obtain execution of the order at the lowest possible price, Sutton began to work the order through the Pershing Listed Block Desk.  His initial order to Pershing was a $50,000 share market order with a top of 5-1/16 placed at 15:51.  By telling Pershing that it was a

---

*(footnote continued from previous page)*
and wealth of Mr. Saba when analyzing the alleged violative activity.  In context, one must remember at least the following facts:

- Saba is an extremely wealthy investor;
- In just his Tentafin account, the monthly asset balances for June 1999 was $328,058,835.56 down from the prior month by more than $120,000,000.; for July 1999 was $309,381,825.45; and for August 1999 was $329,316,252.75.
- It was not uncommon for Mr. Saba to trade hundreds of thousands of shares of a stock on any given day, and it was not uncommon for Mr. Saba to actually be put multimillion dollar positions and hold them in his accounts for months, nor was it uncommon for hundreds of

*(footnote continued on next page)*

PX21-0009

**Confidential Treatment Requested**

market order with a top, Sutton was telling them that they had some discretion to work the

$50,000 share order, but ultimately if the order was not filled within the "top" they were to get

back to Sutton so he could give them instructions as to how to complete the order. While the

"top" serves as a "working limit" order, the order has to be filled because it is a market order not

a limit order. Sutton's testimony explains how this works in practice. For e.g.,

> "Q.    I guess the one issue though that we're trying to get
> at is what's the difference between what you're doing and a limit
> order? Before you had indicated with a limit order –
>
> A.    The difference is if I told them to buy 25,000 shares
> at 16 top, I have a half million share order to buy stock at the
> market and they give me – I take that order. I go down and give
> them 25,000 shares with a 16 top. They call me back, they say you
> know what, we're able to buy 12,000 shares at 16, it's now 16 to
> 16 1/8, what do you want to do.
>
> I look around, I say you know what, take whatever balance
> you have and take some more stock and now take a 16 1/8 top and
> let's see where we go and they come back and go we jut caught
> somebody selling stock at 16 1/18, he's got another 50 sell, what
> do you want to do. You know what, take another 50 at 16 1/8.
> Now we finish that, that's working a market order. A limit order is
> buy half a million shares at 16, okay. You put down the half a
> million shares at 16, it trades 16.30, I'm out, I'm not involved any
> more." Sutton testimony, p. 114

In this case, Pershing put the 50,000 share order through to the specialist. Because there was a

5 1/16 top, Pershing treated this type of order in its instructions to the specialist as a "limit" order.

This is because the "top" as far as the specialist was concerned functioned as a "working limit."

---

*(footnote continued from previous page)*
thousands of shares of stock to be called away from him as a result of open and un-hedged
option positions.

B1272877.1

6/12/2003 6:33 PM

PX21-0010

Confidential Treatment Requested

When it was apparent that the Staff's questioning and Mr. Sutton's answering were becoming unclear, Mr. Crane, Sutton's counsel, took the liberty of summarizing Sutton's testimony to repeat what Sutton had said about "working a not held market order." Neither Sutton nor the Staff disputed Mr. Crane's summary. For purposes of clarity, it is repeated here.

"Mr. Crane:    I'm going to interject since there's no pending question. I think you're talking semantics.

Mr. Lee:    Okay, I'll make a note of it for the record.

Mr. Crane:    I don't think – given what he's told you the instruction was he believes he would have made looking at the notes, they could have placed that order in any other way to the New York Stock Exchange other than the way it's been placed. You can ask him that.

Ms. Finston:    So in essence what you're suggesting is that across the board in every single instance when a market order is indicated on a Middlegate trade ticket handled by your client, we will find that the New York Stock Exchange has treated this as a limit order.

Mr. Crane:    It's telling you that when a series of trades are made in a relatively large transaction, not 5,000 shares, or – and a market trade where they are told buy x at up to y price and he's working a market order, that whenever that happens, the only way they can communicate that their authority is only to y price is to call it a limit when they send it to the Exchange. There's no other way they have to tell them that's the limit of their authority and your people should ask that question to Pershing." Sutton testimony, pp. 125-126.

"Mr. Crane:    Actually to be more precise the question I think you should be asking Pershing is if he gives them an order and uses the phrase "tops," do they understand it that he's working a market order with a price limit for that moment which means they should get back to [him] versus giving them an order saying this is a limit order, would they process those two things any differently when they send it to the Exchange and get that confirm. I think you're going to find it's going to be identical but they will tell you." Sutton testimony, p. 126. Counsel's summary is of Sutton's testimony beginning on p. 100 and ending on p. 118.

Sutton and Pershing continued to work the market order with tops as follows:

50,000 buy at 5 3/16 at 15:54
25,000 buy at 5 3/16 at 15:57

PX21-0011

25,000 buy at 5 1/8 at 15: 58
55,000 buy at 5 3/8 at 15:59[4]

The net result of this trading was to ensure that the trades had as little or no effect on the per share price while getting the best available price.[5]

Mr. Sutton's order ticket reveals that Pershing reported to Sutton how it executed the order of the Tentafin 200,000 share order as follows:

- 4,400 @ 5
- 64,300 @ 5 1/16
- 20,000 @ 5 1/8
- 111,300 @ 5 3/16

Gross average price 5.1369

The merged order report relied upon by the Staff was prepared for them by Pershing. The Pershing Block Trading Desk's order tickets, however, are not consistent with Mr. Sutton's order ticket that he filled out simultaneous with the Pershing trader's reporting its execution to Mr. Sutton. Inexplicably, Pershing's merged order report of the subject trade execution on the NYSE likewise is not entirely consistent with Pershing's block trader's order tickets. This suggests further that not only did Sutton not have manipulative intent, he did not entirely control the trade execution challenged by the Staff.

---

[4] Pershing apparently was comfortable ending up long 5,000 shares.
[5] A trader has an order to buy 75,000 shares of XYZ stock – at the market – Not Held. The current inside market for XYZ is $10.00 Bid $10.05 Ask. Based on the trader's assessment of the current supply/demand balance (taking into account such variables as inside market, size, volume, general market conditions, etc.) he decides to work the order in 25,000 share increments. He calls the Block Desk and says – "I have a market not held order to buy XYZ." "Take 25,000 with a 10.05 "top" Since this "market not held" order being "worked" in 25,000 share increments, communicating the order in this manner using the term "Top" lets the block desk know that this is a "working market, not held order". The "Top" serves as a "working limit". The block desk will know that it must update the trader on the status of this "increment" in a timely manner so that any changes in the "top" can be made, or in the event that the entire increment is completed, the next increment may be "worked".

B1272877.1                                                          6/12/2003 6:33 PM

Confidential Treatment Requested

Underlying the Staff's theory of manipulation is the assumption that Saba's goal was to avoid his Tentafin account being put 860,000 shares of TZA at $5.00 per share which the Staff assumes would happen if the price of TZA closed at or below $5.00 on August 20, 1999. That assumption is simply incorrect and the Staff's reasoning flawed. The evidence is in fact to the contrary. Mr. Saba stood to gain from being put the 860,000 shares in his Tentafin account at $5.00. The puts at $5.00 were hedged by Tentafin's being short 11,500 TZA calls @ $5.00 expiring November 20, 1999, and a put at $5.00 deducting the premiums earned on the short TZA puts, lowered his cost basis in the stock to the low $4.00 range making the hedge profitable. Had Saba been put TZA at $5.00, this would have been consistent with his goal of cost averaging that month's put assignment of 815,000 TZA shares to Tentafin at $7.50 per share; 500,000 of which were assigned Tentafin August 20, 1999.

To understand Saba's strategy, one must (a) calculate the premium Tentafin earned on shorting the 8600 puts at $5.00 and 8150 puts at $7.50, (b) calculate the average price he paid for the 815,000 and 200,000 shares of TZA Tentafin was put at $7.50 and purchased at $5.1369 respectively, (3) calculate the benefits of the premium Tentafin earned on shorting 11,500 call at $5.00 expiring November 20, 1999, which gave the owner of the call Tentafin shorted the guaranteed him the right to sell 1,150,000 shares of TZA to Tentafin at $5.00 anytime before the

PX21-0013

Confidential Treatment Requested

November 20, 1999 close.  This calculation is illustrated here:

## AVERAGE COST CALCULATION

\* All amounts include commissions

| | | |
|---|---|---|
| Cost of Stock assigned @ 7.50 | | |
| 815,000 × 7.50 (plus commission)  = | $ | 6,136,962 |
| | | |
| Cost of Stock Purchased in Open Market | | |
| 200,000 × 5.1369 (plus commission)  = | $ | 1,033,383 |
| **TOTAL** | $ | 7,170,345 |

| | | |
|---|---|---|
| Premium Amt. from 7½ pts. | $ | (1,060,536.10) |
| Premium Amt. from 5 pts. | $ | (765,883.88) |
| **TOTAL PREMIUM INC.** | $ | (1,826,419.98) |

### SHARES
815,000 – from assignments of 7.50 pts.
200,000 – from open market purchases
1,015,000 – Total Shares Purchased

| | | |
|---|---|---|
| Total Purchase Cost of S&K | $ | 7,170,345 |
| Less:  Total Premium Income | ($ | 1,826,420) |
| | $ | 5,343,925 |
| Divide by # of Shares (1,015,000)  = | | **$5.265** |

**COST AVG.
PER SHARE
BASED UPON
TENTAFIN
PURCHASE OF
200,000
SHARES OF
TZA AT $5.00**

## III.   THE BACKGROUND OF MOISES SABA AND ALBERT SUTTON

Mr. Saba is a businessman that spends the bulk of his time now overseeing and managing

his and his family's multi-billion dollar portfolio of investments.  The portfolio is largely

concentrated in telecommunications, manufacturing and real estate.  He is by all accounts a

6/12/2003 6:33 PM

B1272877.1

-14-

PX21-0014

Confidential Treatment Requested

sophisticated investor with over 20 years of investment experience. Saba's investment accounts at Middlegate carry assets in the range of $300,000,000 to $500,000,000 consisting of roughly 25 securities positions he follows closely. Mr. Saba typically trades daily at Middlegate between 500,000 and 2 million shares of stock, and roughly 30,000 option contracts.

Albert Sutton is a high net worth account broker with more than 20 years of industry experience. He is one of Middlegate's founding partners, and has an unblemished record in the industry. He has never had a customer complaint nor has any regulator ever disciplined him.

## IV. THE STAFF'S RECOMMENDATION AMOUNTS TO NOTHING MORE THAN THEIR PREFERRING THEIR VERSION OF THE DISPUTED EVENTS OVER THE TESTIMONY OF Mr. SABA AND Mr. SUTTON

### A. The Trade Execution Does Not Reveal Manipulative Intent

There is nothing in the record that reveals Mr. Saba instructed Mr. Sutton to place a series of limit orders to buy TZA at progressively higher prices to peg the price above $5.00 at the close. To the contrary, Sutton and his supervisor both testified that the Tentafin order in question, like generally all Saba's orders, were market orders with a top price and were "not held" orders meaning that Sutton was to work the order to insure Saba got the best price available. The record also reveals that Sutton's order ticket for the Saba order was in fact worked as a "not held" order, and Pershing's block trader's order tickets reveal that he in fact worked the order in increments with a limit reporting back execution to Sutton. That block trader who in working the order apparently entered limit prices in order to reflect the "market with a top" instructions. Similarly, Sutton's order ticket reveals that the executions reported to him by the Block Trader were in increments different from what the Block Trader seems to have

B1272877.1                                              6/12/2003 6:33 PM

PX21-0015

Confidential Treatment Requested

achieved with the floor trader. There is also nothing in the investigatory record that we know of to indicate that Saba communicated with the Block Trader, or that Saba communicated with Sutton as Sutton worked Saba's Tentafin order.

Saba instructed Sutton to purchase 200,000 shares of TZA at the market. Their course of dealing was well established from years of doing daily business which meant Sutton had a legal, ethical and fiduciary duty to execute Saba's Tentafin order as a "market not held" order to achieve best execution. He did just that. He did not solicit the order. He worked the order without employing any artificial and fraudulent trading techniques. Sutton didn't engage in wash sales or painting the tape, and Sutton did not inflate the market with a 200,000 share "held market order" on volume that day of roughly 64,000 shares. Moreover, given Saba's usual and customary daily trading practices, nothing about Saba's order suggested that a broker should take pause and question Saba's intentions or motives. The order size was routine, the manner in which it was communicated was routine, there were no special trading instructions to Sutton that differed from their ordinary dealings, and the order was for one of the 25 or so securities he often traded at Middlegate. Saba did not tell Sutton the whole order should be "held" or worked directly against the specialists' offer; all facts that might make a broker suspicious in that such instructions would indicate the client doesn't care what he pays for the stock but instead is interested only in seeing that buying outweighs selling at the close. Again, the investigatory record is devoid of any such facts or obligations.

The Staff's conjecture that Saba manipulated TZA's close to prevent 8,600 puts being assigned Tentafin is not only unsupported by the investigatory record, but is bereft of economic sense. The Staff in effect contends that Saba, by all accounts a sophisticated and avid stock

PX21-0016

Confidential Treatment Requested

trader, spent $1 million dollars purchasing almost four (4) times that day's daily volume to accomplish something he could have easily accomplished for a fraction of the cost in a manner that would have been far less likely to attract attention. Similarly, the Staff simply supposes that Saba wanted TZA to trade above $5.00. That supposition again ignores the fact that if the stock trades above $5.00 Tentafin's being short 11.500 calls at $5.00 means it could be required to sell 1,500,000 shares of TZA at $5.00. One has to ask, what is the rationale to spending one million dollars ($1,000,000) driving TZA above $5.00 only to have 1,150,000 shares called away at a lower price? The Staff's suspicion and conjecture is without even a scintilla of direct admissible evidence that would support their suspicions, and ignores the adverse financial implications associated with the strategy.

### B. The Size and Timing of Saba's Order Does Not Suggest An Intentional Effort to Orchestrate A Higher Close

A review of TZA's total volume on August 20, 1999 cuts against the Staff's theory that Saba's intent in buying at the end of the day was intended to peg TZA's price at or above $5.00 per share. Total volume that day was 264,000 shares, Saba's 200,000 share purchase at the end of the day accounts for most of that day's volume. If one accepts that premise that sellers want a high price and buyers want a low price, one can conclude that a day's total volume up to 3:50 p.m. of a mere 64,000 shares means that there were not a lot of sellers willing to sell at or below $5.00 per share. Saba's order was for more than 300% of the day's total volume. Had Saba wanted to simply peg TZA at or above $5.00 per share, he could have given Sutton a "held" market order for a small percentage of that day's total volume. That would have obviously

B1272877.1

6/12/2003 6:33 PM

PX21-0017

Confidential Treatment Requested

resulted in seller's willing to sell at increasingly higher market prices as the close approached. Saba did not do this.

### C.    None of the Usual Indicia of Manipulative Intent are Present And The Staff's Rationale Suggesting Saba's Motive Makes No Economic Sense

The investigatory record contradicts the Staff's suspicions of wrong doing in several ways.  The evidence is that Saba's Tentafin order to buy TZA was in fact executed in a way that least affected the stock's price irrespective of whether one believes the Staff's version that Sutton entered Saba's order as a limit order in increments, or Sutton's version that he worked the order on a "not held" basis with a top.

The Staff's assertion that Saba would benefit from manipulating the close because he would keep the roughly $753,000 premium he earned on shorting the put at first blush suggests a valid motivation.  Upon reflection, however, that allegation is another supposition unsupported by the record and contradicts economic reality.  If the 8600 TZA puts were assigned Tentafin at $5.00, Tentafin would have to purchase the 860,000 shares at $5.00 represented by the shorted put.  TZA consistently traded between roughly $4.50 and $5.44 in the 30 days prior to August 20, 1999.  The August 20, 1999, TZA inter-day low was only $4.94 and the first Tentafin purchased was made at 3:41 pm was at $5 1/16.  Therefore, assuming all 860,000 TZA shares at $5.00 are put to Tentafin, the "paper loss" that day would be between 8¢ and 50¢ per share, or stated differently, $68,800 to $430,000.  Given Saba's financial wherewithal, and the lack of price range volatility in preceding four weeks there was limited risk that such a paper loss would become a real loss.  Nonetheless, according to the Staff's theory, Saba therefore caused his Tentafin Account to advance and put at risk more than one million dollars ($1,000,000) buying

PX21-0018

Confidential Treatment Requested

TZA stock to protect between $68,800 and $430,000 of his earned premium. That theory makes no economic sense. Moreover, the fact that Saba did not immediately begin selling the 200,000 TZA shares when the "put risk" was gone, and the 200,000 shares were profitable underscores the fact that the Staff's assumptions are just conjecture. To this same end, Tentafin had far more to risk financially from being short 11,150 TZA calls at $5.00 if TZA traded above $5.00; it is irrational to conclude Saba would do anything to purposely drive the price of TZA above $5.00.

Moreover, it's obvious from pre-trade volume that day of only about 64,000 shares that Saba committed far more capital than was necessary to peg TZA at or above $5.00 per share. If Saba intended to simply keep TZA above $5.00 on the Close, it would follow that he would have sold the TZA position once the put risk dissipated. He did not, and instead held the position for months. This fact weighs heavily against the Staff's manipulation theory and contradicts the Staff's theory of motive. All this clearly suggests Saba's goal was to acquire TZA stock at or about $5.00 per share to cost average down the day's net cost when he realized late in the day on August 20, 1999 that the $5.00 puts may not be assigned based upon its trading price near the close. The Staff's theory to the contrary is just conjecture.

## V.   ANALYSIS OF THE STAFF'S MARKET MANIPULATION THEORY IN THE CONTEXT OF SECTIONS 9 (a)(2) AND 10(b)

Section 9(a)(2) and (6) of the Exchange Act provides that:

> "... it shall be unlawful for any person , directly or indirectly, ... to effect, alone or with one or more persons, a series of transactions in any security registered on a national securities exchange ... with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others. ... [or] to effect either alone or with one or more other persons any series of transactions for the purchase and/or sale of any

PX21-0019

Confidential Treatment Requested

> security registered on national securities exchange for the purpose of pegging, fixing, or stabilizing the price of such security in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

15 U.S.C. § 78i(a)(2) and (6).

Violations of Section 9(a)(2) and (6) constitute:

> "a "manipulative, deceptive, or other fraudulent device or contrivance" prohibited by Exchange Act Section 10(b) and Rule 10b-5. *In re: Alan Bennett Harp*, 1984 SEC Lexis 2608, proceeding dismissed at 1985 WL 548317 (SEC Release No. ); *In re: Halsey, Stuart & Co., Inc. and Harold L. Stuart*, SEC Release No. 4310."

There is no direct evidence that Sutton, Saba and Tentafin, individually or collectively, caused TZA to close above $5.00 dollars on August 20, 1999 for the purpose of inducing others to buy the stock to increase its market price on a given day, or with the specific intent to peg or fix the price of the stock artificially both practices which would suggest manipulative intent. To the contrary, Saba has a reasonable and rational explanation to explain the timing of the Tentafin order, and Sutton worked the order consistent with his duty of best execution and in a manner that least affected the TZA's price. The Staff should be hard pressed before being allowed to proceed against them. Indeed, in an Opinion of General Counsel published at Exchange Act Release No. 3056, 1941 SEC Lexis 1827; 11 FR 10984 (October 1941), the Commission's General Counsel observes that "[b]ringing about a price rise by extensive purchases is not unlawful in itself; this was recognized by the Senate Committee on Banking and Currency, which, in its report on the Act prior to its passage, said:

> To manipulate the price of a security by any series of transactions with the specific intent of raising or depressing the price, is

PX21-0020

**Confidential Treatment Requested**

> prohibited . . .. Any extensive purchases or sales are bound to
> cause changes in the market price of the security, but mere
> knowledge on the part of the purchaser or seller that his
> transactions will have this effect is not sufficient to bring him
> within the scope of this provision. Thus, if a person is merely
> trying to acquire a large block of stock for investment, or desires
> to dispose of a big holding, his knowledge that in doing so he
> will affect the market price does not suffice to make his actions
> unlawful. –Sen. Rep. No. 792, p. 17, 73d Congress, 2d Session.

The General Counsel's learned observations are evident in the Commission's order

dismissing the administrative proceeding in the Staff's prosecution entitled *In Re: Alan Barrett

Harp*, 1985 WL 548317. The Staff's theory that Tentafin's purchase of 200,000 shares of TZA

during the last 10 minutes of the August 20, 1999 trading day was intentionally manipulative to

stave off a large put of TZA stock, is not unlike the theory the commission rejected in <u>Harp</u>'s

appeal. Mr. Harp was alleged to have entered a series of manipulative stock purchases because

his client would benefit from an increase in share price. In dismissing the proceeding against

Mr. Harp, the Commission observed that "[w]e agree with our staff that, in connection with

Harp's activities involving Wainoco, there were a number of suspicious circumstances.

However, we are not persuaded that the evidence establishes that Harp engaged in a

manipulation." *Harp*, 1985 W.L. 548317. In short, the Commission seems to have recognized

that when there are competing rational explanations for one's purchase of stock that has the

affect of causing its price to rise, the fact that some evidence or suspicious circumstances may

suggest the purchases were for an unlawful purpose, will not alone sustain a market manipulation

claim. Here, Saba had multiple sound financial reasons explaining the 200,000 share purchases

of TZA at the end of the day, and a very real financial disincentive to seeing the stock trade

above $5.00.

B1272877.1                                                6/12/2003 6:33 PM

PX21-0021

Confidential Treatment Requested

The Staff's theory against the Proposed Respondents again amounts to nothing more than conjecture. The circumstantial evidence relied upon by the Staff could equally plausibly suggest Mr. Saba was not trying to avoid being put TZA stock but was in fact acquiring TZA stock to average down a put of 815,000 TZA shares at $7.50 per share, when it seemed doubtful he would be put sufficient $5.00 TZA stock from the very option the Staff contends he was fighting off. Moreover, the fact that Mr. Sutton worked Mr. Saba's order in a manner that least affected TZA's stock price demonstrates that Sutton's motive was not to peg the price above $5.00 at the close. To this same end, Saba's Tentafin account held the "suspect" shares of TZA for months following the purchase in question and did not "flip" it the next day into higher market. This is strong direct evidence that weighs heavily against the Staff's theory of manipulation. The Staff's theory against Saba and Sutton is based on no direct evidence that they acted with a manipulative intent. To the contrary, the direct evidence is that Mr. Saba had a legitimate, albeit complicated, investment strategy that he implemented. Mr. Sutton worked the order in a way that least affected the stock's price.

## VI.   ALLEGATIONS THAT THE PROPOSED RESPONDENTS ACTED WITH AN INTENT TO MANIPULATE TZA'S SINGLE DAY CLOSING PRICE FOR AN UNLAWFUL PURPOSE ARE EASILY REBUTTED

Section 10(b) makes it unlawful for any person to use or employ in connection with the purchase or sale of a security any manipulative device of contrivance . . .and Rule 10b-5 defines manipulative and deceptive devices by making it unlawful for any person in such connection to (1) employ any device, scheme, or artifice to defraud, . . . or (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. 15 U.S. C. 78j(b); 17 C.F.R. 240.10b-5. Violation of the market manipulation prohibitions in Section

B1272877.1                                                            6/12/2003 6:33 PM

PX21-0022

Confidential Treatment Requested

9(a)(2) and (6) of the Exchange Act in the context of securities on a National Exchange like the NYSE constitute schemes or artifices to defraud under Section 10(b) and Rule 10b-5 of the Exchange Act. *In the Matter of Barrett & Company*, 1941 SEC Lexis 150; 9 S.E.C. 319 (May 22, 1941).

To make out a Section 10(b and Rule 10b-5 violation against Saba and Tentafin, the Staff must allege and subsequently prove by a preponderance of the evidence that Saba, (1) caused Tentafin to purchase 200,000 shares of TZA on August 20, 1999 at a time, (2) and in a manner, that created actual or apparent trading in TZA at a predetermined price, (3) in such amounts that Saba knew or was reckless in not knowing, would cause the price of TZA to stabilize or increase above $5.00 per share at that day's close, (4) that in doing so Saba's and Tentafin's conduct operated or would expect to operate as a fraud or deceit upon any person, and (5) that Saba and Tentafin possessed the specific intent to defraud at the time of their actions. See generally, Barrett, at 1941 SEC Lexis 150.  This the Staff cannot do.

The Staff's contention that Saba's scheme to defraud arises out of the size, price limitations, and timing of Tentafin trade is just speculation.  The size of Saba's order, 200,000 shares, was part of an effort to (a) dollar cost average that day's roughly 815,000 share put of TZA at $7.50 per share, and (b) guess at how many shares he would need to buy at $5.00, since TZA was trading at about $5.00 as the close neared and it was unclear how much if any of the $5.00 put he faced would be put.  On volume that day of 64,000 a sophisticated investor could readily conclude that some percentage of the $5.00 TZA puts, may be assigned even if the stock

PX21-0023

Confidential Treatment Requested

closed at or just above $5.00.[6]  Saba's decision to wait until the end of the day to purchase TZA

is logically and credibly explained once the Staff's assumption that Saba didn't want to be put

TZA at $5.00 per share is disregarded as a false assumption.  Saba did in fact want to be put

TZA at $5.00 to dollar cost average that day's $7.50 TZA puts at a time when he was short

11,500 TZA calls.  He waited until the end of the day to determine whether he needed to buy

stock to dollar cost average the $7.50 TZA put or rely on being assigned some or all of the $5.00

TZA puts.  He did not want to see TZA trade above $5.00 because Tentafin was short 11,500

calls at $5.00.

The Staff's contradictory theories relating to how the Tentafin order was placed in terms

of size increments and limit versus market order are without evidentiary support.  Inconsistencies

in the contemporaneous trading records obtained by the Staff from Middlegate, Pershing and the

NYSE do not suggest Mr. Sutton intended to manipulate the closing price of TZA for Saba's

advantage when he "worked" Tentafin's order.  On the other hand, testimony by Mr. Sutton and

his supervisor Mr. Saba's orders are generally large so it is understood all such orders are to be

worked by Middlegate as "market not held" orders, rebuts the Staff's supposition that Saba

and/or Sutton manipulated TZA's closing price by entering a series of limit orders at

progressively higher prices. Mr. Sutton's order tickets reveal that Saba's Tentafin order was a

"market order" at approximately 3:50 p.m..  Mr. Sutton and his supervisor, Ester Verdiger, both

testified about the subject order and the Sutton order ticket to purchase the 200,000 TZA.  Sutton

had little memory of the trade, but was clear and consistent as to how he and Saba communicate

---

[6]  TZA historical prices reveal that available on Yahoo! Finance reveal that TZA closed at $4.94 on
*(footnote continued on next page)*

6/12/2003 6:33 PM

PX21-0024

**Confidential Treatment Requested**

about orders.  Sutton said Saba directs orders to him, and seldom if ever asks Sutton for market advice.  Sutton testified, as did Verdiger, that all Saba's orders unless otherwise requested, are taken as "market not held" requiring Sutton to work the order to obtain best execution.  The testimony concerning the Sutton order ticket for the trade in question reveals that it was a not held order for 200,000 shares, and that he worked the order in increments with a limit to Pershing's block-trade.  The Staff without reason discounts Sutton's order ticket, and contends Sutton conveyed limit orders to Pershing, then and conclude from this that Sutton was "pegging" TZA at a set price.  This conclusion, however, is not supported by the investigatory record.  There is no conclusive evidence one way or another to our knowledge of how the Pershing Block Trader worked the Tentafin trade for Mr. Sutton.  We have been informed, however, that as of August 1999 Pershing's operational limitations resulted in "market orders with a top" being documented and recorded as a limit orders that are worked by the trading desk.

The investigatory record is devoid of any evidence that Saba knew or intended his order to affect TZA's closing price.  In fact, if you reject the Staff's speculation that Saba didn't want to be put TZA at $5.00, and accept the notion that he was looking to acquire TZA stock to cost average the $7.50 TZA put Tentafin was assigned August 20, 1999, the fact that Saba's end of day "not held" market order is evidence that he <u>didn't</u> intend to move the market, and in fact was trying to avoid affecting TZA's price.  Indeed, it is self evident on a day where only 64,000 shares of TZA traded prior to 3:50 p.m. that day, a **market order held to the book for 200,000 shares** would have moved TZA stock substantially.  If Saba had intended to affect a price

---

*(footnote continued from previous page)*
August 19, 1999.  In fact between July 21 1999 and August 19, 1999 TZA closed above $5.00 per
*(footnote continued on next page)*

PX21-0025

Confidential Treatment Requested

increase in TZA with his trade, as the Staff contends, he could have done so with a market order

held to the book, and could have done so without having to purchase 200,000 shares of a stock

on daily volume of only 64,000 shares.

### VII.    SUTTON Had No Reason To Jeopardize His Career

Mr. Sutton has been in the securities business since 1998, and has no regulatory or

disciplinary history.  His clients, Mr. Saba and Tentafin have been doing business with Sutton on

a transactional basis where Sutton simply takes orders and works them to achieve best execution.

Saba does not rely on Sutton for advice.  Sutton had no reason to jeopardize his career on a

whim.  The TZA puts the Staff claims Saba and Tentafin were trying to stop from being assigned

were not Sutton's recommendation.  The Saba/Tentafin order to purchase 200,000 shares of TZA

on August 20, 1999 at 3:50 p.m. was an unsolicited order.  Sutton had no vested interest in

"protecting" Tentafin from the Put as the Staff contends.  If the Put was assigned, Sutton stood to

earn more commission upon the assignment, and again more commission when the TZA stock

was later sold.  Saba purchase of 200,000 shares of TZA from Sutton was typical of the business

Saba does with Sutton.  In short there is no rational no reason for Sutton to engage in this alleged

single act of manipulation and jeopardize his career.

### IX.  CONCLUSION

The SEC to our knowledge has never filed an action on the basis of such tangential and

minimal circumstantial evidence as is present here.  The Commission rejected the Staff's and

hearing officer's conclusions and opinions, and dismissed the case in the Appeal of Barrett Harp

---

*(footnote continued from previous page)*
share on five (5) times.

B1272877.1                                                                          6/12/2003 6:33 PM

PX21-0026

Confidential Treatment Requested

discussed above. In that case, the facts and allegations were far more suspicious and not easily explained like those in this case.

The Staff's position and recommendation is apparently based entirely on one circumstantial piece of evidence, the fact that Saba placed his order to buy TZA at 3:50 p.m. when it was possible that Saba's account would be put 860,000 shares of TZA if the price closed at or below $5.00 per share. This recommendation is made by the Staff in spite of the fact that all the testimonial evidence is that Saba was not interested in stopping the TZA put as the Staff alleges, and was instead trying to cost average $7.50 shares of TZA to being put that day to his Tentafin account when it became unclear whether or not he would be put additional shares at $5.00. Finally, the Staff's recommendation against Sutton is not supported by the investigatory record, and fails to take into account the fact that the various trading records are self contradictory, and Sutton had NO motivation for doing what the Staff alleges he did.

The Staff in its efforts to drill in and find a market manipulation has clearly drilled a "dry hole" here. While at first glance the timing of Saba's TZA trading may seem suspicious, the weight of the investigatory record rebuts the Staff's suspicions. It is sheer speculation to allow a case to be brought on the thin sheen of suspicious facts that the Staff suggests are present in this case.

Based upon the foregoing, we believe the Staff's recommendation to charge Mr. Saba, Tentafin and Mr. Sutton with anti-fraud violations of the Exchange Act alleging market manipulation is substantially unjustified by the record. Mr. Saba, Tentafin and Mr. Sutton therefore respectfully requests the Staff reconsider its proposed recommendation or, alternatively, urges the Commission not to authorize the imposition of an action against them.

B1272877.1                                                              6/12/2003 6:33 PM

PX21-0027

**Confidential Treatment Requested**

Respectfully submitted,
Moises Saba, Tentafin LTD, and Albert Sutton

By their attorneys,

Roger Crane, Esq.
Steven N. Fuller, Esq.
Nixon Peabody LLP
357 Madison Avenue
New York, New York
Phone 212/940 3000

Dated at New York, New York June 12, 2003

PX21-0028