UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                       :

SECURITIES AND EXCHANGE COMMISSION, :     04 Civ. 1584 (RJH)
                                        :

                     Plaintiff,          :
                                        :      **MEMORANDUM**
           - against -               :   **OPINION AND ORDER**
                                         :

MOISES SABA MASRI and                    :
ALBERT MEYER SUTTON,                :
                                           :

                     Defendants.       :
                                           :
------------------------------------------------------------x

      The Securities and Exchange Commission ("SEC") brings this action against

Moises Saba Masri ("Saba") and Albert Meyer Sutton ("Sutton") for violating Section

10(b) of the Securities Exchange Act and Rule 10b-5 thereunder.  The SEC alleges that

Saba and Sutton manipulated the closing price of a security, T.V. Azteca S.A. de C.V.

American Depositary Receipts (TZA), on August 20, 1999.  Defendants move for

summary judgment under Rule 56 of the Federal Rules of Civil Procedure dismissing

plaintiff's complaint in its entirety.  For the reasons stated below, defendants' motion is

granted in part and denied in part.

## BACKGROUND

      The following facts, drawn from the parties' Rule 56.1 statements, affidavits,

depositions, and other exhibits, are undisputed.  The inferences and conclusions drawn

from these facts, however, are not.  Defendant Saba is a Mexican citizen and resides in

Mexico.  He is an active trader of securities and makes thousands of trades each year.

Beginning in 1998, Saba began trading securities in accounts held at Middlegate

Securities Limited, a brokerage firm located in New York City. Sutton is an Executive Vice President of Middlegate, and was the registered representative handling Saba's brokerage accounts at all relevant times. Tentafin Limited ("Tentafin"), an Irish company, owned an account at Middlegate through 1999 with total assets measuring in the hundreds of millions of dollars. (Decl. of David A. Feldman ("Feldman Decl."), Exs. 5–12.) Saba opened and directed trades in this account, which were handled, without discretion, by Sutton. Sutton and Saba had an informal understanding that, in the absence of contrary instructions, allowed Sutton to fill an order at an average price within approximately one-eighth of the price that prevailed at the time the order was placed by Saba. (Reply Decl. of Moises Saba Masri ("Saba Reply") ¶ 3.)

TZA is a security traded on the New York Stock Exchange. On December 15, 1998, Saba deposited 1,301,100 TZA shares into the Tentafin account from another account owned by Saba and his father at Middlegate. Between December 15, 1998 and August 31, 1999, through the Tentafin account at Middlegate, Saba sold and bought back TZA put[1] and call[2] options as well as TZA shares. Between February 24 and March 3, 1999, Saba sold 8,600 TZA August 5 put options,[3] earning a net premium of $765,883.88. Between February 24 and their expiration on August 21, there were thirty-two days on which the TZA August 5 put options were "in the money." (Feldman Decl.,

---

[1] A put option gives the buyer an option to "put" to the seller 100 shares of stock at a strike price at any time up until expiration. If assigned, the seller of the option is obligated to purchase the shares at the strike price. A put option is "in the money" when the trading price of the security drops below the strike price.

[2] A call option gives the buyer an option to "call" from the seller 100 shares of stock at a strike price at any time up until expiration. If assigned, the seller of the option is obligated to sell the shares at the strike price. A call option is "in the money" when the trading price of the security rises above the strike price. One means of hedging against a call option, or reducing the risk to the seller of the call option, is to purchase the underlying security at a price at or below the strike price so that it is available for delivery should the call option be assigned.

[3] The TZA August 5 put option expired on August 21, 1999, and allowed the buyer of the option to sell 100 TZA shares to the seller at a strike price of $5.

Ex. 25.)  However, no TZA August 5 put options were assigned to Tentafin.  (Defs.' Rule 56.1 Statement ¶ 48.)  In addition, Saba sold 8,150 TZA August 7.5 put options, earning a net premium of $1,060,536.10.[4]  These options were "in the money" every day from sale to expiration and each one was assigned to Tentafin by the settlement date on August 23, requiring Tentafin to purchase 815,000 TZA shares at $7.50 per share plus commissions, for a total cost of $6,136,962.  (*Id.* ¶¶ 53, 78.)  In addition to TZA options, Saba had sold put options for a number of other securities set to expire on August 21, 1999.  Finally, Saba sold a total of 11,500 TZA November 5 call options, earning a net premium of $1,151,948.82.

Between August 17 and August 19, 1999, Tentafin's cash account had a positive balance ranging from roughly $58,000 to $670,000.  Between those same dates, Tentafin had a fed call[5] ranging from roughly $590,000 to $7,500,000.  Saba could have satisfied the fed call by liquidating any of a number of positions in the Tentafin account.  On August 20, 1999, Tentafin had a net worth of roughly $292 million, its cash account had a balance of roughly $670,000, and it had a fed call of roughly $4 million.  After all assignments and expirations of options took place in connection with Tentafin's positions with an August 21, 1999 expiration date, the fed call was satisfied.  (Defs.' Rule 56.1 Statement ¶ 80.)

At the start of the trading day on August 20, 1999, Saba controlled over two million TZA shares in the Tentafin account and over ten million TZA shares in another account at Middlegate.  In the afternoon of August 20, 1999, Saba called Sutton and

---

[4] The TZA August 7.5 put options also expired on August 21, 1999, and allowed the buyer of the option to sell 100 TZA shares to the seller at a strike price of $7.50.

[5] A "federal call" or "fed call" requires an account holder to deposit funds or securities in the amount of the call, or to liquidate positions sufficient to meet the fed call.

requested that Sutton purchase TZA shares for the Tentafin account.  After placing the

order with Sutton, Saba left his office for the day and had no further communications

with Sutton.  The parties dispute the size of the order placed by Saba because the original

order ticket indicated that amounts of 100,000 and 150,000 had been written on the ticket

and crossed out before 200,000, the number of TZA shares ultimately purchased, was

written in below.  (Decl. of Ryan Farney ("Farney Decl."), Ex. 8.)  Sutton executed

Saba's order by effecting seven discrete orders through a floor trader, Ira Sabin, for an

average price of $5.1369 during the final ten minutes of trading that day.  One unrelated

trader also executed one order for 3,000 TZA shares during those ten minutes.  The

following table summarizes these trades:

| Time | Quantity | Price | Limit (best ask[6] at time of trade) | Best bid[5] immediately after trade |
|------|----------|-------|--------------------------------------|-------------------------------------|
| 3:51:43 | 4,400 | $5.00 | $5.0625 ($5.0625) | $4.9375 |
| 3:51:57 | 45,600 | $5.0625 | $5.0625 ($5.0625) | $4.9375 |
| 3:54:51 | 18,700 | $5.0625 | $5.1875 ($5.1875) | $5.125 |
| 3:55:09 | 31,300 | $5.1875 | $5.1875 ($5.1875) | $5.125 |
| 3:57:34 | 25,000 | $5.1875 | $5.1875 ($5.1875) | $5.0625 |
| 3:58:16 (unaffiliated order) | 3,000 | $5.125 | Unknown ($5.125) | $4.9375 |
| 3:59:00 | 20,000 | $5.125 | $5.125 ($5.125) | $5.125 |
| 4:00:02 | 55,000 | $5.1875 | $5.375 ($5.1875) | Market close |

At the close of the market on August 20, 1999, the price and the best bid for TZA

were both above $5.  Saba's purchases constituted approximately 94% of all TZA buy-

side activity during the last hour of trading on August 20, 1999, and 75% of all buy-side

activity for the day.  The 200,000 share purchase exceeded by 20,000 the average daily

volume of shares traded over the preceding thirty trading days.

---

[6] On the NYSE, trades are generally executed at a price between the prevailing "best ask" and the
prevailing "best bid."  Buy orders are commonly executed closer to best ask and sell orders are commonly
executed closer to best bid.

On August 25, 1999, $27,399,980 was transferred into the Tentafin account. No fed call existed at the time of this transfer. On August 31, 1999, Saba transferred 1,301,100 TZA shares out of the Tentafin account and back into another account at Middlegate (the same number originally transferred in late 1998). By their expiration date on November 20, 1999, all 11,500 TZA November 5 call options were assigned to Valleygreen Ltd., the Saba account to which Tentafin had transferred its position on these options, and Saba was required to deliver 1,150,000 TZA shares at $5 per share. The 200,000 TZA shares that Saba purchased on August 20, 1999 were sold at this time.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). In reviewing the record, the district court must assess the evidence in "the light most favorable to the non-moving party," resolve all ambiguities, and "draw all reasonable inferences" in its favor. *Am. Cas. Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir. 1994); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

The moving party can satisfy its burden by showing that the opposing party is unable to establish an element essential to that party's case and on which that party would bear the burden of proof at trial. *See Celotex*, 477 U.S. at 321; *Gallo v. Prudential Servs*., 22 F.3d 1219, 1223–24 (2d Cir. 1994) ( "[T]he moving party may obtain summary

judgment by showing that little or no evidence may be found in support of the nonmoving party's case.").  Indeed, summary judgment is "mandated" when "the evidence is insufficient to support the non-moving party's case." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998).

If the moving party meets its burden, the "non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial." *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996); *Celotex*, 477 U.S. at 322–23.  An alleged factual dispute between the parties will not by itself defeat a motion for summary judgment, since "the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original).  Specifically, the non-moving party cannot rely on mere allegations, denials, conjectures, or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.  *See id.* at 256–57; *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002).

## DISCUSSION

The SEC contends that defendants purchased 200,000 TZA shares on August 20, 1999, in order to push the price of TZA above $5, thus causing the TZA August 5 put options to expire worthless and avoid the required purchase of 860,000 shares at $5 per share.  The SEC's complaint alleged that Tentafin had "limited buying power," making it a serious drain on Saba's resources to pay the roughly $4.3 million to purchase the shares that might have been put to him had the TZA share price remained below the $5 strike price.  (Compl. ¶ 23.)  However, discovery has shown that Saba had an adequate cash balance to satisfy the put options, without requiring him to liquidate any of his valuable

holdings.  In its moving papers, the SEC abandons this contention and states only that Saba did not want to spend the money to buy 860,000 TZA shares at $5.  (Pl.'s Mem. of L. in Opp'n ("Pl.'s Opp'n") at 17.)  Saba instead asserts that he had legitimate economic motives for purchasing 200,000 TZA shares.  He argues that the purchase was made to average down the cost of the TZA shares that he stood to be put from the remaining August 7.5 put options[7] and also to ensure a sufficiently low average price of TZA shares to allow him to make a profit if the TZA November 5 call options were assigned (which they were).

Defendants make two principal arguments in moving for summary judgment. First, they argue that regardless of intent, an open-market transaction (such as end-of-day stock purchases) unaccompanied by other deceptive or fraudulent conduct cannot, as a matter of law, support a finding of market manipulation under Section 10(b) of the Securities Exchange Act.  Second, they argue that even if the transaction could constitute manipulative conduct for purposes of securities law, the SEC has failed to demonstrate a genuine issue of material fact exists as to whether they had the requisite manipulative intent.  The Court now turns to defendants' first argument.

## I.     Manipulative Conduct

Several statutes and regulations proscribe manipulation of securities markets. Section 10(b) of the Securities Exchange Act prohibits the use "in connection with the purchase or sale of any security" of "any manipulative or deceptive device or contrivance" as defined by the S.E.C.  15 U.S.C. § 78j(b).  Further, Rule 10b-5 thereunder makes it unlawful:  "(a) to employ any device, scheme, or artifice to defraud,"

---

[7] That is, by purchasing TZA shares around $5 in addition to purchasing TZA shares at $7.50 that were put to him, Saba was able to bring down the average cost of his TZA share purchased during July and August 1999.

or "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Section 9(a)(1) explicitly forbids several common types of market manipulation, known as matched orders[8] and wash sales,[9] that involve fictitious transactions and do not result in any change of beneficial ownership. 15 U.S.C. § 78i(a)(1). Finally, Section 9(a)(2) more broadly prohibits securities transactions that "creat[e] actual or apparent active trading in such security, or rais[e] or depress[] the price of such security, for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2).

The Supreme Court has found the use of the word "manipulative" in Section 10(b) to be "virtually a term of art when used in connection with securities markets. It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 198 (1976). "The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999). Market manipulation "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977). Such conduct, closely resembling fraud, is patently manipulative, serving no purpose other than to transmit false information to the market

---

[8] A matched order is an "order to buy and sell the same security, at about the same time, in about the same quantity, and at about the same price." Black's Law Dictionary 1124 (7th ed. 1999).
[9] A wash sale is a "sale of securities made at about the same time as a purchase of the same securities . . . resulting in no change of beneficial ownership. Black's Law Dictionary 1339 (7th ed. 1999).

and artificially affect prices.  The defendant's manipulative intent can be inferred from the conduct itself.

However, market manipulation can also be accomplished through otherwise legal means, such as short sales and large or carefully timed purchases or sales of stock.  In these cases, the transaction is real, to the extent that beneficial ownership is changing and the volume of trading is reflective of market activity.  The difficulty in such "open-market" cases, where the activity in question is not expressly prohibited, is to "distinguish between legitimate trading strategies intended to anticipate and respond to prevailing market forces and those designed to manipulate prices and deceive purchasers and sellers."  *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d Cir. 2001). The question arises whether manipulative intent alone is enough to make open-market transactions manipulative and in violation of securities laws.

One appellate court has held that it is not.  The Third Circuit in *GFL Advantage Fund, Ltd.* affirmed the lower court's rejection of a defense based on the claim that plaintiff had manipulated the market through open-market activities.  Plaintiff allegedly undertook large-scale short selling to depress stock prices and allow conversion of credit into a larger number of shares.  *Id.* at 194–97.  Reluctant to find that legal conduct could violate securities laws based only on manipulative intent, the court additionally required "that the alleged manipulator injected inaccurate information into the market or created a false impression of market activity."  *Id.* at 205.  Such evidence could include, *inter alia*, unauthorized placements and parking of stock, secret sales without disclosing the real party in interest, guaranteeing profits to encourage short selling by others, fraudulently

low appraisals, painting the tape,[10] and matched orders. *Id.* at 207–08. This reluctance may be explained by the fact that it is unusual in American law to impose liability based solely only on the intent of the actor.[11] There may also be a concern that because of the ambiguity and difficulty in establishing intent, prohibition of otherwise legal conduct based only on an actor's intent might chill and deter socially desirable conduct. *See* Daniel R. Fischel and David J. Ross, *Should the Law Prohibit "Manipulation" in Financial Markets?*, 105 Harv. L. Rev. 503, 523 (1991).

Despite these considerations, another circuit has accepted the possibility that open-market transactions can constitute market manipulation if done with manipulative intent. In *Markowski v. SEC*, defendants argued that they could not be convicted of market manipulation based on otherwise legal transactions involving "(1) maintaining high bid prices . . . and (2) absorbing all unwanted securities into inventory" because their bids and trades were "real." 274 F.3d 525, 527–28 (D.C. Cir. 2001). In rejecting their argument, the Court of Appeals for the District of Columbia Circuit found reasonable an SEC order sustaining a disciplinary action based on this conduct "in light of what appears to be Congress's determination that 'manipulation' can be illegal solely because of the actor's purpose." *Id.* at 529; *cf. Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 383 (S.D.N.Y. 1973) ("The securities laws do not proscribe all buying or selling which tends to raise or lower the price of a security. . . . So long as the investor's motive in buying or selling a security is not to create an artificial demand for, or supply of, the security, illegal market manipulation is not established."). There is also some support in

---

[10] "'Painting the tape' signifies creating an appearance of trading activity without an actual change in beneficial ownership." *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 767 (LBS), 2002 U.S. Dist. LEXIS 24049, at *18 n.8 (S.D.N.Y. Oct. 10, 2002).

[11] For example, it is hornbook criminal law that one is not punished solely for a criminal state of mind (mens rea), but only where one's action is prohibited as well (actus rea).

the legislative history of the Securities Exchange Act that Congress envisioned liability for market manipulation where the conduct was entirely legal, but the intent was manipulative.  *See* H.R. REP. NO. 1383, 73rd Cong., 2d Sess. 20 (1934) (stating that under the Securities Exchange Act, "if a person is merely trying to acquire a large block of stock for investment, or desires to dispose of his holdings, his knowledge that in doing so he will affect the market price does not make his action unlawful.  His transactions become unlawful only when they are made for the purpose of raising or depressing the market price").

However, as Judge Sand has noted, "the law of the Second Circuit on so-called open-market manipulation—where the alleged manipulator has made otherwise legitimate trades, yet with the subjective intent to affect the stock price thereby—is not yet fully settled."  *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 767 (LBS), 2002 U.S. Dist. LEXIS 24049, at *21 (S.D.N.Y. Oct. 10, 2002).  Only two Second Circuit cases have even tangentially addressed the issue.  In *United States v. Regan*, the Second Circuit affirmed the conviction under Section 10(b) of a trader who arranged for another firm to heavily short sell a stock on a single occasion, without disclosing to the broker-dealer either the identity of the actual seller or the fact that his firm had conversion rights in the stock at issue.  937 F.2d 823, 829 (2d Cir. 1991).  The court found, with little discussion, that the trader's conduct had "artificially depressed" the market price, and fit "comfortably within [the] full range of wrongful acts" proscribed as manipulative.  *Id.*  The court did not make clear whether its finding of liability rested on the trader's nondisclosure and purchases through a proxy, or whether, instead, the court believed that manipulative intent alone (as evidenced by those features of the

transaction) could support a finding of market manipulation based on open-market trading.

In *United States v. Mulheren*, which was decided one month after *Regan* but which did not mention the earlier opinion, the government accused the defendant of making large purchases of a stock in the middle of a trading day for the purpose of artificially increasing the price (and triggering a prior agreement benefiting an acquaintance, Ivan Boesky). 938 F.2d 364, 366–68 (2d Cir. 1991). The court assumed, explicitly without deciding and despite "misgivings," that an investor could lawfully be convicted of market manipulation for an open market transaction where the sole intent of such transaction was to artificially affect the price of a security. *Id.* at 368. It then proceeded to dismiss the case on the grounds that the government had failed to prove beyond a reasonable doubt that the defendant's sole intent in making the purchases was to raise the stocks price, rather than for investment. *Id.* at 369–72; *see also In re College Bound Consolidated Litigation*, No. 93 Civ. 2348 (MBM), 1995 U.S. Dist. LEXIS 10684, at *14 (S.D.N.Y. July 31, 1995) (declining to decide whether manipulative intent is itself sufficient to support liability because plaintiff failed to plead the necessary elements of market manipulation). Thus, the Second Circuit has explicitly declined to answer the first question presented in this case—whether manipulative intent alone can support liability for otherwise legal open-market transactions.

Lower courts in this district have, at least on first blush, come out on different sides of the issue. In *Nanopierce Technologies, Inc. v. Southridge Capital Management LLC*, Judge Sand expressed reluctance to find market manipulation based on open-market trading alone. 2003 U.S. Dist. LEXIS 21854, at *23–*27. He dismissed a complaint that

lacked allegations of "deceptive practices" suggesting the open-market transaction was manipulative. *Id.* Such allegations may include suspicious timing, transactions comprising a high percentage of trading volume, sales through a non-market maker, or a pattern of prior manipulation. *Id.*; *see also SEC v. Martino*, 255 F. Supp. 2d 268, 287 (S.D.N.Y. 2003) (listing price leadership, exercise of dominance in market for the security, attempts to reduce floating supply, and collapse of market after manipulator's activities cease as factors indicating market manipulation); *SEC v. Resch-Cassin & Co.*, 362 F. Supp. 964, 976 (S.D.N.Y. 1973) (same).

In contrast, Judge Scheindlin in *In re Initial Public Offering Securities Litigation*, found no authority in case law or academic literature supporting any additional requirements in "so-called open-market" cases. 241 F. Supp. 2d 281, 391 (S.D.N.Y. 2003). Instead, she described those cases as merely "involving conduct that stands near the line between illegal and legal activity because their resolution turns less on conduct and more on the intent of the defendants." *Id.* However, the distinction between these cases may be more illusory than real. The additional "requirements" found in cases such as *Nanopierce* are not (at least exclusively) clear examples of deceptive or fraudulent conduct. Rather, they include features of open-market transactions themselves that give rise to an inference of manipulative intent—for example, timing, size, or repetition of a transaction.

This case involves a specific type of conduct that sets it apart from a bare purchase or sale of stock on the open market. End-of-day transactions or "marking the close" is defined as "the practice of repeatedly executing the last transaction of the day in a security in order to affect its closing price." *SEC v. Schiffer*, No. 97 Civ. 5830 (RO),

1998 WL 226101, at *1 (S.D.N.Y. May 5, 1998); *see also In the matter of Kocherhans*, 52 S.E.C. 528 (Dec. 6, 1995) (defining "marking the close" as "the practice of attempting to influence the closing price of a stock by executing purchase or sale orders at or near the close of the market.").[12]  It should be stated clearly that stock transactions made at the close of the day are not prohibited.  Indeed, studies have shown that trading in organized securities is heaviest just before the market closes, as traders monitor activity and their positions throughout the day before conducting their trades.[13]  Fischel and Ross, *supra*, at 520.  Nonetheless, the timing of these transactions is more capable of artificially affecting the price of the security, and for this reason, the SEC argues they are more likely to be manipulative.

While perhaps the timing of these transactions provides some limited evidence of manipulative intent, the SEC goes too far in arguing that end-of-day transactions, by themselves, have long been actionable as market manipulation and that Congress "clearly intended" such conduct to fall within the ambit of Section 10(b).  (Pl.'s Opp'n at 5, 15.) Several of the cases it cites do not even involve such transactions.[14]  Of the two that do, one involved significant additional deceptive conduct.  In *SEC v. Martino*, the defendant actively sought to control the supply of stock entering the marketplace, made formal agreements to avoid driving down stock prices, implemented self-imposed sale

---

[12] This can include: (1) making extensive and successive purchases or sales in an attempt to move the price and lock in a higher price at close or (2) ensuring the last transaction of the day is a purchase or sale, which moves the closing price either up to the higher ask price or down to the lower bid price (typically a very small spread).

[13] In this case, in fact, an independent party purchased TZA stock less than two minutes before the close of trading on August 20, 1999.

[14] In *SEC v. Resch-Cassin & Co.*, there were no allegations of "marking the close," but instead market manipulation was based on defendant's "aggressive campaign" to maintain an artificially high stock price over an extended period by making extensive above-market purchases, generating phony trading activity, and maintaining control over floating supply of stock.  362 F. Supp. at 976–79.  Likewise, in *Markowski*, there were no allegations of "marking the close," but instead the SEC alleged that defendants had supported the price of a security by publishing non-bona fide quotations and absorbing all the unwanted securities into their inventory.  274 F.3d at 527.

restrictions with others, insured market makers, and along with her partners, was the high bidder on thirty-one out of thirty-two consecutive trading days. 255 F. Supp. 2d at 275–79.

The SEC does find limited support in *THC, Inc. v. Fortune Petroleum Corp.*, where the court found that allegations that defendant, over a two month period, timed transactions to occur at the close of the market to set the closing price with the intent of lowering the price stated a cause of action for market manipulation. 96 Civ. 2690 (DAM), 1999 U.S. Dist. LEXIS 4039, at *11–*12 (S.D.N.Y. Mar. 31, 1999). In doing so, the court apparently assumed that "marking the close" by itself could constitute market manipulation. However, the court did not even discuss the obviously unsettled state of the law in the Second Circuit with regards to market manipulation through open-market transactions. Defendants are thus correct when they assert that none of the cases cited by the SEC[15] clearly hold that "marking the close" by itself, if done with manipulative intent, can constitute market manipulation.

This uncertainty, however, is not reflected in SEC settlement orders,[16] which regularly base liability for market manipulation on "marking the close" alone. *See, e.g.*, *In the matter of Myron S. Levin*, 50 S.E.C. 1245 (Sept. 1, 1992) ("marking the close"

---

[15] The SEC also cites to *In the matter of Charles C. Wright*, 3 S.E.C. 190 (Feb. 28, 1938), *rev'd on other grounds sub nom. Wright v. SEC*, 112 F.2d 89 (2d Cir. 1940), as suggesting that open-market purchases made to push up the price of stock, in that case to make options profitable, are actionable as market manipulation. However, in that case, the transactions at issue occurred over five days and increased the price of the security by 67%, the defendant used a number of fictitious names and phony accounts to complete the transactions, and the defendant bought 18,500 shares and sold 52,800 shares of an equity with an average daily volume of trading in the preceding three months of only 730 shares. The commission had no difficulty finding that the transactions, with deceptive features and accompanied by deceptive conduct, were manipulative. *See also In the matter of J. Newman & Co.*, 1978 SEC LEXIS 2403 (Jan. 17, 1978) (ten days of massive short selling to depress prices and render call options worthless and failure to notify broker that some sales were short sales as required by securities regulations).

[16] In a settlement order, the respondent neither admits nor denies liability, and the order (including the theory of liability asserted therein) is not reviewed by any Article III court. Thus, their value as authority is limited.

during four separate periods from three weeks to two months duration on two exchanges in order to satisfy margin calls); *In the Matter of Andrew Doherty*, 50 S.E.C. 624 (Aug. 12, 1991) (placing final order of day to ensure closing price was based on higher ask price for a period of four and a half months to satisfy margin calls); *Kocherhans*, 52 S.E.C. 528 (effecting forty-seven purchases over six months within fifteen minutes of market close in the accounts of family members and customers to satisfy margin calls); *In the Matter of Jacob Schaefer, and Evans & Co.*, 1977 SEC LEXIS 1302 (July 11, 1977) (successfully causing stock to close at a price higher than the prior sale price on approximately 253 days out of a total of approximately 424 trading days in order to increase value of holdings). Thus, the SEC initiates enforcement proceeding based on its understanding that "marking the close," at least over a stretch of consecutive days, can by itself constitute market manipulation given the requisite manipulative intent. Even so, such an interpretation has not been endorsed by any Article III court, nor is it binding on this Court.

The foregoing discussion of the legal landscape unfortunately does not readily provide an answer. The Court must approach the question keeping in mind the purpose of securities law to "prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded." *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 337 (S.D.N.Y. 2004) (quoting *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 861 (7th Cir. 1995) (Posner, C.J.)); *see also* H.R. Rep. No. 1382, 73d Cong., 2d Sess. 11 (1934) (securities

laws designed to "give to investors markets where prices may be established by the free and honest balancing of investment demand with investment supply.").

On balance, the Court declines to adopt defendants' proposed *per se* rule that open-market activity cannot be considered manipulative based solely on manipulative intent, that is, without additional deceptive or fraudulent conduct. *GFL Advantage Fund, Ltd.* appears to have created a new requirement in market manipulation cases that is neither found in the governing statutes and regulations, nor supported by any other precedent in the Second Circuit or elsewhere. *See* 272 F.3d at 205 (requiring allegations of deceptive practices that "injected inaccurate information into the market or created a false impression of market activity"). Such a requirement would unnecessarily and improperly place conduct that intentionally distorts prices outside the scope of Section 10(b).[17]

The Court concludes, therefore, that if an investor conducts an open-market transaction with the intent of artificially affecting the price of the security, and not for any legitimate economic reason, it can constitute market manipulation. Indeed, "the only definition [of market manipulation] that makes any sense is subjective—it focuses entirely on the intent of the trader." Fischel and Ross, *supra*, at 510.[18] Allegations of other deceptive conduct or features of the transaction are only required to the extent that they render plausible allegations of manipulative intent. In this case, the SEC alleged that

---

[17] While the *GFL Advantage Fund* court would not likely accept the rationale, it may be argued that an open-market transaction made with manipulative intent in fact injects inaccurate information into the marketplace. That is, transactions in a properly functioning market reflect participants' judgments as to the value of a traded security; however, a transaction entered with manipulative intent distorts the functioning of the market and sends a false message to its participants.

[18] The commentators further define manipulative trades as "profitable trades made with 'bad' intent—in other words, trades that meet the following conditions: (I) the trading is intended to move prices in a certain direction; (2) the trader has no belief that the prices would move in this direction but for the trade; and (3) the resulting profit comes solely from the trader's ability to move prices and not from his possession of valuable information." Fischel and Ross, *supra*, at 510.

(1) defendants conducted activity within several minutes of the close of trade; (2) the transactions constituted a large majority of the purchases that day; (3) Saba had outstanding put options expiring that day that he did not wish to be assigned; and (4) by purchasing 200,000 shares, he was able to avoid being assignment of these options. The Court finds that these allegations are sufficiently indicative of manipulative intent so as to state a claim for market manipulation.

## II.      Manipulative Intent

Having found that the SEC has adequately alleged market manipulation based on manipulative intent, the Court must next consider whether they have proffered sufficient circumstantial evidence[19] of defendants' intent to survive a motion for summary judgment. Before turning to the evidence presented by the parties, the Court must decide the related question of whether an open-market transaction unaccompanied by deceptive or fraudulent conduct can support liability for market manipulation where the defendant has both a manipulative and non-manipulative intent, whether it requires that the sole intent be to artificially affect the price of the stock, or whether some other standard is appropriate.

The Court holds that in order to impose liability for an open market transaction, the SEC must prove that *but for* the manipulative intent, the defendant would not have conducted the transaction. The Court reaches this conclusion based on three considerations. First, in *Mulheren*, the Second Circuit accepted, with "misgivings," the government's theory that an open-market transaction could violate Section 10(b) where it

---

[19] Not surprisingly, there is no direct evidence, such as statements by Saba or Sutton that they purchased TZA shares at the end of the day on August 20, 2007 to artificially inflate its price. *See In re The Federal Corp.*, 25 S.E.C. 227, 230 (1947) ("Since it is impossible to probe into the depths of a man's mind, it is necessary in the usual case . . . that the finding of manipulative purpose be based on inferences drawn from circumstantial evidence.").

was done with the "sole intent" to affect the price of securities, and not for any "investment purpose." 938 F.2d at 368.[20]  Because the Second Circuit accepted the government's theory only with "misgivings," then *a fortiorari*, it would find problematic a theory under which an investor could be found liable for market manipulation when only one of the investor's purposes was to alter the price.  Second, if a transaction would have been conducted for investment purposes or other economic reasons, and regardless of the manipulative purpose, then it can no longer be said that it is "artificially" affecting the price of the security or injecting inaccurate information into the market, which is the principal concern about manipulative conduct.  *See Ernst & Ernst*, 425 U.S. at 198 (manipulative "conduct [is] designed to deceive or defraud investors by controlling or artificially affecting the price of securities.").  Finally, given the inherent ambiguity in determining intent, the concerns about imposing liability for otherwise legal activity based solely on intent, and the potential for chilling such legal activity, the Court finds it wise to err on the side of caution.

### A.    Evidence of Manipulative Intent

In general, the question of whether a plaintiff has established the requisite intent for a Section 10(b) violation is a factual question "appropriate for resolution by the trier of fact."  *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999).  The SEC lists a number of factors that it believes are sufficiently indicative of Saba's manipulative intent to raise a genuine issue of material fact.  These include (a) the timing, size, and incremental execution of the transaction, (b) the unorthodox nature of the order ticket and (c) Saba's allegedly inconsistent and irrational explanations as to why he purchased the

---

[20] The government's theory, as further explained by the court, was that where "the transaction is effected for an investment purpose  . . . there is no manipulation, even if an increase or diminution in price was a foreseeable consequence of the investment."  *Mulheren*, 938 F.2d at 368.

shares on August 5. The SEC's theory is quite simple: concerned that his August 5 puts would expire "in the money," forcing him to purchase over 800,000 TZA shares, Saba placed a large TZA order in the closing minutes on the day before expiration in order to artificially drive the price over $5 per share, thereby insuring that the options would expire worthless.

Saba argues, with some force, that none of this purported evidence of manipulative intent stands up to scrutiny. First, the fact that this transaction was executed at the end of the trading day provides little indication of manipulative intent, as trading is heavily concentrated at the end of the day.[21] Saba plausibly contends that he waited until the end of the day in order to see whether or not he would be put 860,000 TZA shares as a result of the August 5 put options. Only after he became convinced that he would not be put these shares did he purchase TZA shares on the open market. Second, the considerable size of the transaction, 200,000 shares (75% of the TZA buying activity on that day), actually cuts against a theory of manipulative intent. There is uncontradicted testimony that a smaller purchase would have satisfied Saba's alleged goal of driving the closing price of TZA shares above $5. (*See* Feldman Decl., Ex. 27 (Nothnagel Rep.) at 15); *Mulheren*, 938 F.2d at 370 (evidence that investor purchased more shares than necessary to artificially raise price undermined theory of manipulative intent).

---

[21] In contrast, when a trader conducts end-of-day trading on numerous consecutive days, or on a number of particularly timed but non-consecutive dates, such timing provides stronger circumstantial evidence of manipulative intent. *See Schiffer*, 1998 WL 226101, at *1 (defining "marking the close" as "the practice of *repeatedly* executing the last transaction of the day in a security in order to affect its closing price." (emphasis added)). Indeed, all but one of the settlement orders cited by the SEC or found by the Court involve "marking the close" on multiple days. *See, e.g.*, *In the matter of Harry S. Pack*, 1993 SEC LEXIS 1364 (May 27, 1993) (basing prosecution on the placement of 127 buy orders at or near the end of the day, all but two of which were the minimum order necessary to affect the closing price; *In the Matter of Schultz Investment Advisors, Inc.*, 2005 SEC LEXIS 3331 (Dec. 28, 2005) (basing prosecution of broker on repeatedly "marking the close" on the last trading day of the quarter for funds whose performance was tied to broker's fees). No evidence of repeated end-of-day transactions has been presented in this case.

Third, while the SEC notes that the trade was executed in discrete segments with the price limit set at (and in one instance above) the prevailing "best ask" price, the floor trader conducting the transaction testified that the trade was a "best execution" transaction, that is, an attempt to place a large market order in a thinly traded stock with the *least* impact on the price of the stock. (Feldman Decl., Ex. 31 (Sabin Tr.) at 12–16, 80; *see also* (Feldman Decl., Ex. 27 (Nothnagel Rep.) at 16–17.) In particular, the final executed trade had a limit of $5 3/8, not $5 1/8, the amount that would have been necessary to ensure that the price of TZA would close above $5; instead, a limit of $5 3/8 is consistent with an attempt to fill an order of 200,000 shares before market close. However, the SEC also points to the order ticket that Sutton filled out after receiving Saba's order, which had the quantities 100,000 and 150,000 crossed out, and 200,000 written in. Apparently, the SEC's theory is that Saba told Sutton to purchase up to 200,000 shares in order to keep the price artificially inflated above $5. But both Sutton and the then-president of Middlegate offer a competing and reasonable explanation. They assert that because of the size of the transaction and the time of day, Sutton thought that he would be unable to fill the full order, and so he raised the order number as he completed the transaction in increments. (Feldman Decl., Ex. 29 (Sutton Tr.) at 120–121; Farney Decl., Ex. 6 (Verdiger Tr.) at 45–46.)

Finally, the SEC contends that Masri's explanations for the transaction are inconsistent and economically irrational. Saba has offered two explanations for his purchase of TZA shares in the closing minutes of August 20, 1999. First, during initial investigations in 2002 and throughout this lawsuit, Saba has contended that he purchased the 200,000 TZA shares to average down the cost of the nearly 500,000 TZA shares he

was assigned on the same day at $7.50 per share. In his 2005 deposition, Saba additionally suggested that his purchase was a hedge against the November 5 call options, to make sure he had TZA shares purchased at a low enough price that he would still make a profit if the options were assigned. A fair reading of Masri's entire testimony could indicate that he was not offering an inconsistent reason but rather a supplemental reason why his 200,000 share purchase at $5/share made sense. In the SEC's view, neither reason makes economic sense. If Saba really wanted to average down the 7.5 puts, they argue, Saba should have brought the shares before August 21 when the price was below $5, or waited to see if the August 5 puts were exercised on August 21 and, if necessary, purchase shares the following trading day to average down the position. The SEC further argues that if Saba wanted to cover the November 5 call options, why wouldn't he use the 2.1 million TZA shares already held in the Tentafin account (or the 2.5 million TZA shares held in a joint account with Saba's father) as opposed to buying shares on August 21 at a price in excess of $5. Saba proffers reasonable replies to the SEC's rhetorical questions, but drawing all reasonable inferences in favor of the SEC, the Court finds that the SEC has successfully raised a genuine issue of material fact as to whether Saba would have conducted the transaction but for his alleged manipulative intent. The Court may find the SEC's evidence of intent to be weak, but it is not so unconvincing as to allow the Court to encroach on the province of the fact-finder at this stage of the proceeding. Therefore, the Court denies defendant Saba's motion for summary judgment.

### III.      Albert Meyer Sutton

The SEC correctly asserts that a broker "can be primarily liable under § 10(b) for following a [principal's] directions to execute stock trades that [he] knew, or was reckless

in not knowing, were manipulative, even if [he] did not share the [principal's] specific overall purpose to manipulate the market for that stock." *SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 108 (2d Cir. 1998). However, the conduct in the quoted case was blatantly deceptive and fraudulent, including insuring others if they conducted trades, effecting trades through undisclosed nominees, and performing wash sales and matched orders. Although the defendant in that case might not have known the principal's *specific* purpose for the manipulative transactions, the only possible purpose for such transactions was to artificially affect the price of the security and thus he must have known that they were manipulative.

In contrast, Sutton merely purchased 200,000 shares, without discretion, at the end of a day after being directed to do so by his principal. There is no evidence that he was even aware of the August 5 put options. There is certainly no direct evidence that Saba told him to drive up the price of TZA shares. On this record, it would be complete and impermissible speculation for a jury to find that he did. Nor is the circumstantial evidence concerning the execution of the transaction—the increasing bids, the crossed-out amounts on the order ticket, or the alleged exceeding of his discretion (by under $0.02 per share)—sufficient to create a genuine issue as to whether Sutton knew, or was reckless in not knowing, that the trades were being conducted by his principal for a manipulative purpose. Sutton managed to purchase 200,000 shares in a thinly traded stock and drive up the price less than $0.15 per share. This is simply not evidence of a broker's intent to artificially increase the price of the shares; nor does it establish a broker's knowledge of any manipulative intent of his principal. Indeed, to hold otherwise would be to put brokers at risk of liability for market manipulation every time they

executed a sizeable order in a thinly traded stock at the end of the day. The SEC's

reference to Saba and Sutton's long-standing relationship, during which neither had ever

been accused or convicted of securities violation, similarly creates no genuine issue as to

any material fact. Therefore, the Court grants Sutton's motion for summary judgment.

## **CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment **[34]** is

GRANTED in part and DENIED in part. The complaint is dismissed as against

defendant Sutton and the Clerk of the Court is directed to remove him from the caption.

SO ORDERED.

Dated: New York, New York
       November 20, 2007

Richard J. Holwell
United States District Judge